[No. D057154. Fourth Dist., Div. One. June 21, 2011.]

CALIFORNIA TRADITIONS, INC., Plaintiff and Appellant, v. CLAREMONT LIABILITY INSURANCE COMPANY, Defendant and Respondent.

412

COUNSEL

Koletsky, Mancini, Feldman & Morrow, Andrew M. Morrow, Raymond C. Dion and Stacy R. Goldscher for Plaintiff and Appellant.

Selman Breitman, Sheryl W. Leichenger, Todd R. Haas and Adam E. Davalos for Defendant and Respondent.

OPINION

**McDONALD, J.**—California Traditions, Inc. (California Traditions), the developer of a housing development, hired Ja-Con Systems, Inc. (Ja-Con), to perform the rough framing work for 30 residential units in the development. Ja-Con was insured under a comprehensive general liability (CGL) policy issued by Claremont Liability Insurance Company (Claremont). A buyer of one of the units sued California Traditions for defective construction, and California Traditions cross-complained against Ja-Con for indemnity.

Claremont initially provided a defense for Ja-Con but subsequently withdrew its defense based on an exclusion in its CGL policy that excluded coverage for work on condominium and townhome projects (the exclusion). California Traditions, after obtaining a judgment on its cross-complaint against Ja-Con for more than $2 million filed this action against Claremont under Insurance Code section 11580 seeking to satisfy from the Claremont CGL policy the judgment it obtained against Ja-Con.

Claremont moved for summary judgment contending that, as a matter of law, the exclusion precluded any possibility of coverage for the claims asserted against its insured because the undisputed facts showed the unit was part of a condominium project. California Traditions opposed the motion, asserting there were triable issues of fact whether Ja-Con had a reasonable expectation of coverage because the units for which it provided framing work had many of the outward appearances of noncondominium detached single-family homes. The trial court granted summary judgment in favor of Claremont, and this appeal followed.

I

FACTUAL BACKGROUND

A. *The Parties*

California Traditions was the developer of a housing development known as Cambria, and acted as general contractor for the development. California

Traditions contracted with Ja-Con to perform the rough framing work for 30 residential units in phases 6 through 8 of Cambria. Ja-Con was insured under CGL policies issued by Claremont in effect during the time Ja-Con performed its work for California Traditions under the contract.

### B. *The CGL Policy and the Exclusion*

The CGL policy provided coverage for amounts the insured became legally obligated to pay because of property damage or bodily injury arising out of the insured's work. However, the policy contained an exclusion, which provided:

"It is agreed that coverage is not provided for property damage or bodily injury that arises out of an insured's operations, work product or products that are incorporated into a condominium . . . or townhouse project.

"This endorsement does not apply if an insured's operations or work occurs after the condominium, apartment or townhouse project was certified for occupancy, except if the work performed is to repair or replace an insured's work that was completed prior to the certification of occupancy."

John Swain, the owner of Ja-Con, knew the policy did not cover work on condominium projects.

### C. *The Project*

The project had 146 separate residences that were freestanding units with no shared walls, roofs, halls, or plumbing or electrical lines. However, to avoid the more restrictive "setback" requirements applicable to single-family homes and allow California Traditions to build a higher density development, the Cambria project was developed, marketed and sold as condominiums.[1] California Traditions recorded "Covenants, Conditions and Restrictions" (CC&R's), and created a homeowners association for the project. The CC&R's defined the residential units within the project with reference to the recorded condominium plan and stated each residential unit would be "a

---

[1] The entitlements obtained from the City of Encinitas were for condominiums, and the final maps for the project allowed development of only condominiums. The recorded plan for the development was described as a "plan of condominium, pursuant to Chapter 1350 et seq. of California Civil Code"; it incorporated the Civil Code definitions for "condominium," "condominium project" and "residential unit"; and it stated the plan was "intended to conform to California Civil Code section 1351(e)." California's Department of Real Estate issued a condominium final subdivision report for the project that stated "THIS PROJECT IS A COMMON INTEREST SUBDIVISION OF THE TYPE REFERRED TO AS A CONDOMINIUM."

separate [freehold] estate not owned in common with the other owners of condominiums in the project."

### D. *The Underlying Lawsuit*

In August 1999 California Traditions sold one of the units to the Wood family (the Woods). The purchase documents stated the unit was a condominium,[2] and the grant deed described the unit as a condominium.

In August 2003 the Woods filed a complaint against California Traditions, among others, alleging they suffered property damages and bodily injury from, among other things, the defective construction of their unit (the underlying lawsuit). California Traditions cross-complained against Ja-Con in the underlying lawsuit, and Claremont initially undertook the defense of Ja-Con. However, Claremont subsequently withdrew its defense of Ja-Con in the underlying lawsuit, informing it that Claremont would neither defend nor indemnify Ja-Con because of the exclusion. California Traditions thereafter obtained a default judgment against Ja-Con in the underlying lawsuit for more than $2 million.

### E. *The Present Action*

In 2008, California Traditions filed the present action against Claremont, alleging claims for recovery of a judgment under Insurance Code section 11580 and for declaratory relief. Claremont answered and asserted, as an affirmative defense, that Claremont did not provide coverage for the underlying lawsuit to Ja-Con because of the exclusion.

Claremont moved for summary judgment, arguing the undisputed facts showed the work performed by Ja-Con triggered the exclusion because it was work that had been incorporated into a condominium project. California Traditions opposed the motion, arguing the term "condominium project" was undefined in the policy and therefore it was ambiguous as to what was excluded from coverage. From this premise, California Traditions argued the exclusion must be interpreted most favorably to the insured, and a reasonable insured would not have construed this language to exclude coverage for work performed on freestanding units that did not bear the indicia commonly associated with a condominium project.

The court concluded the exclusion was not ambiguous, and that there was no potential for coverage because Cambria was a condominium project, and entered judgment for Claremont. This appeal followed.

---

[2] The CC&R's specified the owners would be responsible for insuring their individual units and improvements, and the purchase documents advised the buyers they would be responsible for obtaining any liability or casualty insurance required by their lenders or by the CC&R's.

## II

## LEGAL STANDARDS

### A. *Standard of Review*

The summary judgment procedure is directed at revealing whether there is evidence that requires the fact-weighing procedure of a trial. " '[T]he trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves.' [Citation.] The trial judge determines whether triable issues of fact exist by reviewing the affidavits and evidence before him or her and the reasonable inferences which may be drawn from those facts." (*Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 131 [40 Cal.Rptr.2d 249].) However, a material issue of fact may not be resolved based on inferences if contradicted by other inferences or evidence. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

To prevail on a motion for summary judgment, a defendant must show one or more elements of the plaintiff's cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (*o*).) The evidence of the moving party is strictly construed and that of the opponent liberally construed, and any doubts as to the propriety of granting the motion are to be resolved in favor of the party opposing the motion. (*Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 189 [43 Cal.Rptr.2d 392].) The trial court does not weigh the evidence and inferences, but instead merely determines whether a reasonable trier of fact could find in favor of the party opposing the motion, and must deny the motion when there is some evidence that, if believed, would support judgment in favor of the nonmoving party. (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139 [127 Cal.Rptr.2d 145].) Consequently, summary judgment should be granted only when a moving party is entitled to judgment as a matter of law. (§ 437c, subd. (c).)

Because a motion for summary judgment raises only questions of law, we independently review the parties' supporting and opposing papers and apply the same standard as the trial court to determine whether there exists a triable issue of material fact. (*City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575, 582 [35 Cal.Rptr.2d 876]; *Southern Cal. Rapid Transit Dist. v. Superior Court* (1994) 30 Cal.App.4th 713, 723 [36 Cal.Rptr.2d 665].) In practical effect, we assume the role of a trial court and apply the same rules and standards governing a trial court's determination of a motion for summary judgment. (*Lopez v. University Partners* (1997) 54 Cal.App.4th 1117, 1121–1122 [63 Cal.Rptr.2d 359].) We liberally construe the evidence in

support of the party opposing summary judgment (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517]), and assess whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment under the applicable legal standards (cf. *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850).

## B.  *Construction of Insurance Policies*

The order granting summary judgment turned principally on the trial court's interpretation of the exclusion in Claremont's CGL policy issued to Ja-Con. The legal principles applicable to interpreting insurance policies, which we apply de novo on appeal (*Standard Fire Ins. Co. v. Spectrum Community Assn.* (2006) 141 Cal.App.4th 1117, 1124 [46 Cal.Rptr.3d 804]), are not in dispute. The Supreme Court in *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390–391 [33 Cal.Rptr.3d 562, 118 P.3d 589] summarized those principles as follows:

" 'When determining whether a particular policy provides a potential for coverage . . . , we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.]' [Citation.] [¶] 'The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy.' [Citations.]

"In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts. We reiterated those rules in our decision in [*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265]]: [¶] ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." [Citation.]' [(Quoting *Foster-Gardner, supra,* at p. 868.)]

" ' "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does "[d]isagreement concerning the meaning of a phrase,"

or " 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " [Citation.] " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " [Citation.] "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." [Citation.]' [(Quoting *Foster-Gardner, supra*, 18 Cal.4th at p. 868.)] [¶] . . . [S]tandard form policy provisions are interpreted under the same rules of construction. ' "[W]hen they are examined solely on a form, i.e., apart from any actual agreement between a given insurer and a given insured, the rules stated above apply *mutatis mutandis*. That is to say, where it is clear, the language must be read accordingly, and where it is not, in the sense that satisfies the hypothetical insured's objectively reasonable expectations." ' "

## III

## ANALYSIS

The undisputed facts show, and California Traditions concedes, the underlying lawsuit sought recovery for property damages and bodily injury the Woods alleged were caused in part by the defective construction of the unit they purchased, and that California Traditions's cross-complaint against Ja-Con sought indemnity for those losses based on Ja-Con's work on the unit. The undisputed facts also show the unit was one of numerous units developed and constructed by California Traditions as part of a "condominium project," and was marketed and conveyed by California Traditions as a condominium. Finally, it is undisputed the language of Claremont's policy stated "coverage is not provided for property damage or bodily injury that arises out of an insured's operations, work product or products that are incorporated into a condominium . . . project," and that Ja-Con knew the policy did not cover its work on condominium projects.

We conclude the policy language is not reasonably susceptible to any interpretation other than the clear import of the unambiguous language contained in the exclusion: it does not cover the liability of the insured arising from work that is incorporated into a condominium project. "An insurer may select the risks it will insure and those it will not, and a clear exclusion will be respected. [Citation.] 'Courts may not rewrite the insurance contract or force a conclusion to exact liability where none was contemplated.' " (*Legarra v. Federated Mutual Ins. Co.* (1995) 35 Cal.App.4th 1472, 1480 [42 Cal.Rptr.2d 101]; accord, *Schrillo Co. v. Hartford Accident &*

*Indemnity Co.* (1986) 181 Cal.App.3d 766, 771 [226 Cal.Rptr. 717] [" 'an insurer has a right to limit the policy coverage in plain and understandable language, and is at liberty to limit the character and extent of the risk it undertakes to assume . . .' "].)

■ California Traditions, acknowledging the unit was part of a development "recorded to legally qualify as a condominium project under California [law]," appears to argue the term "condominium project" is nevertheless ambiguous because it is reasonably susceptible to the interpretation that the exclusion would not apply to work performed on units that, although part of a condominium project, are freestanding residential units sharing some similarities with noncondominium single-family residences.[3] California Traditions's argument is premised on the core contention that freestanding residential units would not be understood to be within the ambit of the term "condominium," and therefore the term "condominium project" is ambiguous. We are not persuaded by California Traditions's claim the term "condominium project" is ambiguous, because both the term "condominium" and the term "condominium project" are meticulously defined by statute. (See Civ. Code, § 1351, subd. (f).) More importantly, the interpretation that California Traditions proffers—that an insured would reasonably understand the term "condominium project" to *not include* a project composed of freestanding units—is inconsistent with the term "condominium project" as statutorily defined because California law expressly *includes* freestanding units as one type of a condominium unit that may comprise part of a "condominium project."[4] Civil Code section 1351, subdivision (f), which defines a "condominium project" as a "development consisting of condominiums," goes on to define a condominium as consisting of "an undivided interest in common in a portion of real property coupled with a separate interest in space called a unit, the boundaries of which are described . . . in sufficient detail to locate all

---

[3] California Traditions also asserts that, because its claim under Insurance Code section 11580 places California Traditions in the shoes of Ja-Con, the issue of coverage is "determined at the time the claim is tendered and is based on facts known to the insurer obtained when investigating the claim" (citing *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153] & *CNA Casualty of California v. Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 610 [222 Cal.Rptr. 276]), and argues it is therefore Ja-Con's knowledge at the time of the claim (and not California Traditions's knowledge) that is dispositive. However, those cases addressed the duty to defend, *not* the duty to indemnify, and California Traditions articulates no argument explaining the relevance of the principles outlined in those cases to the issue presented here.

[4] Indeed, the only evidence on what Ja-Con *believed* the project was composed of was the declaration of John Swain, the owner of Ja-Con, who averred that around the time he bid on the job he was "concerned . . . the project may have been a condominium project" because of the existence of the homeowners association. Although Ja-Con bid on the project because California Traditions falsely represented to Ja-Con that it was *not* a condominium project, there is no evidence that the fact the project was composed of freestanding units caused Ja-Con to assume the project was not a condominium project within the meaning of the exclusion.

boundaries thereof. . . . The description of the unit may refer to . . . (3) *an entire structure* containing *one* or more units . . . ." (Italics added.) Thus, the statutory definition of a condominium *expressly contemplates* that a condominium unit may be composed of an entire structure that contains a single unit.[5]

California Traditions argues summary judgment was improper because there is a "triable issue of fact concerning what was actually constructed at the site," because California Traditions filed declarations averring the project was composed of single-family residences. However, these declarations do not raise triable issues of *fact*: the declarations admitted the project was legally designated as a condominium project and establish only that the project was composed of freestanding units. The mere assertion by California Traditions's declarants that they *concluded* the units were "single family residences" does not raise a triable issue of fact precluding summary judgment. " 'An issue of fact can only be created by a conflict of evidence. It is not created by . . . "cryptic, broadly phrased, and conclusory assertions" [citation] . . . .' " (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 525 [89 Cal.Rptr.3d 801]; accord, *Hope Internat. University v. Superior Court* (2004) 119 Cal.App.4th 719, 739, fn. 9 [14 Cal.Rptr.3d 643] ["conclusions of fact are not binding on a summary judgment motion"].)

■ California Traditions also argues summary judgment was improper because there was a triable issue of fact whether Ja-Con had a reasonable expectation of coverage because it believed it was working on noncondominium single-family residences. However, an insured's reasonable expectation of coverage "is merely an interpretative tool used to resolve an ambiguity once it is found to exist" (*Fire Ins. Exchange v. Superior Court* (2004) 116 Cal.App.4th 446, 456–457 [10 Cal.Rptr.3d 617]) and "cannot be relied upon to create an ambiguity where none exists" (*General Reinsurance Corp. v. St. Jude Hospital* (2003) 107 Cal.App.4th 1097, 1108 [132 Cal.Rptr.2d 540]). Even assuming Ja-Con subjectively believed the policy would afford it coverage for this project,[6] the courts have recognized that when a policy clearly excludes any potential for coverage, "[a]ny expectation to the contrary

---

[5] California Traditions also appears to argue that, because there are variations in precisely how the term "condominium" is defined, depending on which dictionary or other definitional source (such as the Federal National Mortgage Association's selling guide) is consulted, the term is reasonably susceptible to more than one interpretation and hence must be construed in accordance with the reasonable expectations of the insured. However, we apprehend that these sources will always phrase their definitions of *any* word with some degree of difference, but that alone cannot mean all words are "ambiguous" for purposes of insurance law.

[6] Although it is unnecessary to this opinion, we reiterate that the only evidence of *why* Ja-Con believed it was not working on a condominium project was that California Traditions misrepresented the nature of the project and induced Ja-Con to bid on the project based on that misrepresentation. California Traditions cites no authority for the counterintuitive proposition that a party may mislead the insured into subjectively believing the insured has coverage and

on the part of the [insured] would have been subjective and unreasonable. A party's subjective intent cannot be used to create an ambiguity or a material factual issue." (*Havstad v. Fidelity National Title Ins. Co.* (1997) 58 Cal.App.4th 654, 661 [68 Cal.Rptr.2d 487].)

California Traditions alternatively argues the exclusion should be deemed unenforceable in this case under the holding of *Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86 [119 Cal.Rptr.2d 62] (*Scottsdale*). California Traditions argues the fact Ja-Con performed framing work on 30 condominium units within a "condominium project" did not materially alter the risk contemplated by the parties under the policy, because Ja-Con would have been covered had it worked on 30 identical structures in a tract of noncondominium single-family residences, and therefore the exclusion is unenforceable under *Scottsdale*.

In *Scottsdale*, the insured was a general contractor insured by Essex, but Essex's policy expressly excluded coverage for damages arising from any joint venture not designated as a named insured. (*Scottsdale, supra,* 98 Cal.App.4th at pp. 89–90.) The insured acted as general contractor to build a house, but the evidence also showed the house was built as part of a joint venture between the insured and Mr. Boris, and Essex argued the exclusion barred coverage because the joint venture was not a named insured. (*Id.* at pp. 90–92.) *Scottsdale*, noting that Essex's policy covered claims against the insured arising from its contracting business, held the exclusion was unenforceable because "whether [the insured] and Boris were involved in a joint venture did not materially alter Essex's risk." (*Id.* at p. 93.)

■ We reject California Traditions's reliance on *Scottsdale* to escape the exclusion in this action because we believe the core concept—that a court may invalidate an exclusionary clause if the court is unconvinced the clause has some significant actuarial basis—is a "derelict on the waters of the law" (*Lambert v. California* (1957) 355 U.S. 225, 232 [2 L.Ed.2d 228, 78 S.Ct. 240] (dis. opn. of Frankfurter, J.)) that should not be perpetuated, for several reasons. First, the legal provenance for this concept appears doubtful,[7] and

---

then step into the shoes of the insured in an Insurance Code section 11580 action against the insurer to profit from its fraudulent conduct.

[7] *Scottsdale* cited three cases to support this aspect of its analysis: *Maryland Casualty Co. v. Imperial Contracting Co.* (1989) 212 Cal.App.3d 712, 725 [260 Cal.Rptr. 797]; *Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, 979 [270 Cal.Rptr. 719]; and *Austin P. Keller Construction Co., Inc. v. Commercial Union Ins. Co.* (Minn. 1986) 379 N.W.2d 533, 535–536. (See *Scottsdale, supra,* 98 Cal.App.4th at p. 93.) None of those cases supported invalidation of an exclusionary clause if a court found there was no material alteration of the risks. The *Imperial Contracting* court expressly stated that, in light of its other conclusions, "*we need not address the joint venture exclusion*" (*Imperial Contracting*, at p. 725, italics added), which comprised the entire extent of the *Imperial Contracting* court's discussion of the

this aspect of *Scottsdale* has gained no traction in any subsequent published case. More importantly, this aspect of *Scottsdale* appears irreconcilable with two interrelated concepts represented by *Argonaut Ins. Co. v. Transport Indem. Co.* (1972) 6 Cal.3d 496 [99 Cal.Rptr. 617, 492 P.2d 673] and *Cohen v. Penn Mut. Life Ins. Co.* (1957) 48 Cal.2d 720 [312 P.2d 241]. In *Argonaut,* our Supreme Court explained that although "escape clauses are generally disfavored in the law . . . '[t]he insurance company is entitled to write a policy which limits its coverage . . . and the limitations in the provisions of the policy must be respected." (*Argonaut,* at p. 508.) There is nothing in that line of authorities that suggests an insurer must convince a court of the actuarial basis for a clear limitation on coverage as a condition precedent to enforcing that limitation. In *Cohen,* our Supreme Court also noted, albeit in a different context, that the fact an insurer "put the questions in writing and asked for written answers [from the insured]" is "itself proof that [the insurer] deemed the answers material" (*Cohen,* at p. 726) to the policy it would issue. (*Id.* at p. 728 [insurer was "entitled to determine for itself the matter of the deceased's insurability, and to rely on him for such information as it desired 'as a basis for its determination to the end that a wise discrimination may be exercised in selecting its risks'"]; accord, *Cal.-West. States etc. Co. v. Feinsten* (1940) 15 Cal.2d 413, 423 [101 P.2d 696] ["answers to written questions set forth in application forms relative to insurance are generally *deemed* material . . ."].) Again, there is nothing in that line of cases that suggests an insurer, having deemed certain matters material to the risks it would insure, may not rely on those matters to deny coverage unless it can convince a court of the actuarial materiality of those matters. Because *Scottsdale* seems to hold that an insured may obviate an otherwise unambiguous limitation on coverage by asserting that matters deemed material to the insurer were in fact immaterial, this aspect of *Scottsdale* appears inconsistent with controlling Supreme Court authority.

Here, the undisputed facts showed Claremont (1) expressly limited its coverage by excluding work on condominium projects, and (2) expressly asked Ja-Con about its work on condominium projects in connection with the

---

subject. The *Reeder* court, addressing whether a joint venture exclusion (which excluded coverage when the joint venture was not designated as a named insured) applied to exclude coverage, noted the policy "discloses the insureds are identified as 'Roundtree Ltd., a California partnership, & DMF Construction, Inc., A Joint Venture,' " which *Reeder* stated may have been "inartful" but may have sufficed to satisfy the exclusion. (*Reeder,* at p. 979.) Although the *Reeder* court went on briefly to muse that there might be some relevance to "whether the joint venture form of doing business adopted by the insureds materially altered Maryland's risk" (*ibid.*), its sole citation for this dicta was to *Imperial Contracting*'s nonholding. (*Reeder,* at p. 979.) The final authority cited by *Scottsdale* is less apposite, because the court in *Austin P. Keller* held the joint venture exclusion was clear and unambiguous and *enforceable,* and contains no suggestion that the exclusion could be invalidated if invalidation would not materially alter the insurer's risk. (*Austin P. Keller,* at pp. 535–536.)

insurance issued to Ja-Con.[8] We decline to perpetuate *Scottsdale*'s suggestion that a court may declare exclusions for specified activities, which activities the insurer has deemed material in both its application and its insuring agreement, to be invalid as immaterial to risks insured by the policy.

■ We conclude the exclusion clearly and unambiguously excluded coverage for work on condominium projects, and there is no triable issue of material fact that the underlying action sought recovery for acts and omissions arising from Ja-Con's work on a condominium project.

## DISPOSITION

The judgment is affirmed. Claremont is entitled to costs on appeal.

Benke, Acting P. J., and McIntyre, J., concurred.

---

[8] In the application for insurance, Ja-Con was asked "[h]ave you ever been involved or do you plan to be involved in . . . Condominium/Townhouse Construction," and Ja-Con answered "No." Additionally, Claremont asserted that Accurate Inspection Services specifically asked Ja-Con about its work on condominiums and Ja-Con answered that it did one "last year[;] however . . . there was separate job specific insurance for that project," and Claremont did not deny that assertion.